## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————————

JOSE M. C.,                                    :
                                               :
              Petitioner,                      :          Civ. No. 20-6236 (KM)
                                               :
       v.                                      :
                                               :
JOHN TSOUKARIS, *et al.*,                      :              **OPINION**
                                               :
              Respondents.                     :
———————————————————————         :

**<u>KEVIN MCNULTY, U.S.D.J.</u>**

## I.      INTRODUCTION

Petitioner, Jose M. C.,[1] is an immigration detainee currently held at the Essex County Correctional Facility ("ECCF") in Newark, New Jersey. He is proceeding by way of counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (DE 1.) The petition also requests a temporary restraining order ("TRO") seeking Petitioner's immediate release from custody. I have treated this application as one for a preliminary injunction as well. Respondents oppose the petition. (DE 7.) Pursuant to Local Civil Rule 78.1, this matter is decided without oral argument. For the reasons set forth below, the petition will be denied.

## II.      BACKGROUND

**A.      COVID-19 Pandemic**

COVID-19 is a viral respiratory illness that has recently caused a global pandemic. *See* Ctrs. for Disease Control and Prevention, *CDC's Response to COVID-19*, https://www.cdc.gov/

---

[1]        Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

coronavirus/2019-ncov/cdcresponse/index.html (last visited June 10, 2020). Since COVID-19 was declared a pandemic by the World Health Organization on March 11, 2020, the virus has infected over 1.9 million people in the United States. *See id.*; *see also* Ctrs. for Disease Control and Prevention, *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited June 10, 2020). Initially, New Jersey was one of the states most impacted by the virus, seeing a sharp rise in cases throughout the months of March and April of 2020. *See* N.Y. Times, *New Jersey Coronavirus Map and Case Count*, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html (last visited June 10, 2020). Since May 2020, fortunately, the overall trend of new cases in New Jersey has sharply fallen. *See id.* Hospitalizations, too, are down more than 75% from their peak on April 14, 2020. *See* New Jersey COVID-19 Information Hub, https://covid19.nj.gov/#Live-updates (last visited June 10, 2020). However, there is not yet a cure or vaccine for this infectious disease and it continues to present a public health threat. *See* Ctrs. for Disease Control and Prevention, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited June 10, 2020).

The COVID-19 virus spreads "mainly through close contact [within about six feet] from person-to-person in respiratory droplets" and from contact with contaminated surfaces. *See* Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads. html (last visited June 10, 2020). In order to thwart the spread of the illness, the Centers for Disease Control and Prevention ("CDC") recommend social distancing (staying at least six feet away from others), wearing cloth face coverings when around others, regular disinfection of "frequently touched surfaces," and washing hands often with soap and water, among other practices. *See* Ctrs. for

Disease    Control    and    Prevention,    *How    to    Protect    Yourself    &    Others*,
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html   (last   visited
June 10, 2020). Obviously, however, the "the best way to prevent illness is to avoid being exposed
to this virus." *See id*.

Although COVID-19 can affect anyone, the CDC has identified groups of individuals who
are deemed to be at "high-risk for severe illness" if infected with COVID-19. *See* Ctrs. for Disease
Control    and    Prevention,    *Groups    at    Higher    Risk    for    Severe    Illness*,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html
(last visited June 10, 2020). These groups include individuals who are 65 years of age and older,
are immunocompromised, or have moderate to severe asthma, among others. *See id.*

## B.    Background

### i.    Procedural History

Petitioner is a 43-year-old native and citizen of El Salvador. (DE 1-3 at 2.) He entered the
United States on July 29, 2005 without authorization. (*Id.*; DE 1 at 6.) Almost 14 years later, on
July 9, 2019, Immigration and Customs Enforcement ("ICE") took Petitioner into custody and
served him with a Notice to Appear ("NTA"). (DE 1-3 at 2.) The NTA charged Petitioner with
removability under section 212(a)(6)(A)(i) of the Immigration and Nationality Act as an individual
present in the United States without having been admitted or paroled. (*Id.*) On July 16, 2019,
Petitioner was released from ICE custody on bond. (DE 1-5 at 5.)

Less than three months after his release, on October 13, 2019, Petitioner was arrested and
charged with third-degree aggravated assault, in violation of N.J. Stat. Ann. § 2C:12-1B(13). (DE
1-4 at 2.)[2] Petitioner was released by the New Jersey Superior Court, Law Division on pretrial

---

[2]        In March 2020, the charge was downgraded to simple assault, in violation of N.J. Stat. Ann. §
2C:12-1A(1) and transferred to municipal court. (DE 1-4 at 2.) Petitioner indicates that in late March 2020,

monitoring, but was re-detained by ICE on October 15, 2019. (DE 1-4 at 4; DE 1-3 at 4.) Petitioner thereafter sought and received a bond hearing in immigration court. (DE 7-7 at 2.) An immigration judge denied Petitioner's request for release, determining that Petitioner was a danger to the community. (*Id.*) In April 2020, Petitioner sought a change in custody status with the immigration court. (DE 1-5 at 7.) An immigration judge again denied Petitioner's request for release, finding that there had been no material change in circumstances warranting a bond redetermination. (*Id.*) Following the denial, Petitioner requested humanitarian parole from ICE. (DE 1 at 9; DE 1-5 at 5.) His request was denied on May 8, 2020. (DE 1-5 at 5.)

ii.     *Petitioner's Health*

Petitioner states that he has "an exacerbated case of hemorrhoids, which continues to be untreated pursuant to medical recommendations placing his immune system in a vulnerable position." (DE 9 at 7–8.) Petitioner's medical records confirm, and Respondents do not dispute, that Petitioner does suffer from hemorrhoids. (DE 8 at 2.)

Petitioner's medical records reveal he has been regularly treated for this condition. (*Id.* at 48–97.) Petitioner first appears to have complained about hemorrhoids on April 5, 2020. (*Id.* at 48–49.) He was prescribed hemorrhoidal suppositories to treat the ailment. (*Id.*) On April 19, 2020, Petitioner again complained of a hemorrhoid and indicated bleeding when he used the bathroom. (*Id.* at 52.) The ECCF medical staff ordered lab work and prescribed Anusol-HC rectal cream and warm compresses. (*Id.* at 53.)  On April 30, 2020, Petitioner was seen by medical staff and denied any medical complaint. (*Id.* at 69.) He stated that "he [was] feeling fine at [that] time." (*Id.*) The medical staff indicated that they would continue to monitor Petitioner. (*Id.*)

---

Petitioner and the local prosecutor's office reached an agreement to have the charges dismissed as long as Petitioner attended anger management classes. (DE 1 at 8–9.) Petitioner states that as a result of the pandemic, however, he has been unable to attend anger management classes and his assault charge therefore remains pending. (*Id.* at 9.)

On May 18, 2020, Petitioner again complained about the presence of hemorrhoids, rectal bleeding, and difficulty sitting down. (*Id.* at 75–76.) After an examination, Petitioner was transferred to the local hospital for further evaluation. (*Id.* at 77–79.) At the hospital, Petitioner was evaluated by a surgeon and informed that he will eventually require surgery for his condition, but that elective surgeries were not currently being performed. (*Id.* at 80.) He was transferred back to ECCF on May 20, 2020, provided Anusol cream, and informed to maintain soft stool and avoid straining. (*Id.*) Petitioner's medical chart states that "[e]lective surgery will be done when it is possible." (*Id.*)[3]

Neither Petitioner's medical records nor the internet article he provided regarding proper treatment for hemorrhoids indicate that his immune system is compromised as a result of his condition. (*See generally* DE 8.) Petitioner states that he is not being treated "pursuant to medical recommendations," but the factual basis for that assertion is unclear. There is no evidence demonstrating that Petitioner is not receiving the treatment recommended by the local hospital or that he is not receiving adequate treatment for his condition in general, pending a time when surgery, which is indicated but elective, can be performed.

## C.     Conditions at ECCF

### i.     *Respondents' Evidence Regarding the Conditions at ECCF*

To delineate the measures ECCF has implemented to combat the spread of COVID-19, Respondents provide a declaration from Alfaro Ortiz, the Director of ECCF, dated May 25, 2020. (DE 7-5.) Mr. Ortiz states that since March 2020, ECCF has taken various measures to ensure the health and safety of detainees during the COVID-19 outbreak. (*Id.* at 5.) The protocols are lengthy and detailed, and I summarize them only briefly.

---

[3]     While at the hospital, Petitioner was given a COVID-19 test which came back as negative. (*Id.* at 97.)

Currently, ECCF is at approximately 66% of its maximum capacity. (*Id.* at 3.) Each ICE detainee housing unit holds approximately 48 people (reduced from the usual 60), and each cell within the housing unit contains two bunk beds. (*Id.* at 3.) The bunk beds are not, however, spaced six feet apart. (*Id.*) The cells are located around the perimeter of the housing unit and in the center of the unit there is a seating area and recreation area. (*Id.*) The spacing within the units allows for detainees to practice social distancing to some degree. (*Id.*)

Since the COVID-19 outbreak, meals are provided to detainees within their cells or in the recreation area of the housing unit. (*Id.* at 7.) ECCF has modified recreation groups to limit close interaction with other detainees and has reduced the number of individuals permitted to take recreation at the same time. (*Id.* at 9.) The facility has also educated detainees in multiple languages and formats about COVID-19 and best practices to prevent the spread of the virus. (*Id.* at 6, 12.) There are signs posted throughout the facility, public service announcements are played on video screens, and live and video presentations are given about COVID-19. (*Id.* at 3, 12.)

ECCF has hired additional staff to increase the cleaning and sanitizing of their facility. (*Id.* at 7.) Each housing unit is sanitized no fewer than "three times per day." (*Id.*) The common spaces and equipment are regularly sanitized, and communal telephones and tablets are cleaned between uses by a "designated detainee" who is supervised by ECCF staff. (*Id.* at 11.) Cleaning agents are available in the communal showers to detainees to clean the areas themselves between uses. (*Id.* at 12.)

For safety and security reasons, the facility does not provide hand sanitizer to detainees. (*Id.* at 10.) However, detainees have "free access to soap." (*Id.*) Despite allegations from some detainees that there is insufficient soap and disinfectant, Mr. Ortiz states, "[t]hat is not true." (*Id.* at 14.) Detainees have free access to soap and water, and some detainees keep multiple bars of

soap in their personal areas. (*Id.* at 14–15.) ECCF receives deliveries of soap every three days and detainees are permitted to have four or five bars of soap at a time. (*Id.* at 15.) The facility is encouraging detainees to use soap as frequently as possible and individuals can request additional soap at any time. (*Id.*) Disinfectant spray is available for detainees to use upon request. (*Id.*) Since disinfectant spray contains bleach, and therefore can be a safety/security hazard, detainees may not keep the disinfectant spray with them. (*Id.*) However, at the beginning of every shift, each correctional officer is issued a bottle of disinfectant spray to use throughout the shift. (*Id.* at 16.) The spray bottle is replenished as necessary and ECCF is encouraging staff and detainees to use the spray often and liberally. (*Id.*)

As for medical care, ECCF is following the testing guidance issued by the CDC. (*Id.* at 12.) Detainees who complain of illness are "immediately evaluated by medical staff." (*Id.*) If a detainee exhibits signs or symptoms of COVID-19, they are provided with a surgical mask. (*Id.*) Individuals with moderate to severe symptoms are transported to the local hospital for evaluation. (*Id.* at 12–13.) Individuals with mild symptoms are placed in a designated quarantine area and isolated from others. (*Id.*) Anyone who is symptomatic and awaiting test results is started on anti-viral medications and their vitals are monitored on a daily basis. (*Id.* at 13.) Detainees who are asymptomatic but have been exposed to someone with confirmed COVID-19 are housed together in a practice referred to as "cohorting." (*Id.* at 14.) If, after fourteen days, no new cases develop, cohorting is discontinued. (*Id.*) Any detainees with health conditions that place them at higher risk of developing serious illness from COVID-19 are housed in a "special needs unit if [their] conditions are not well-controlled." (*Id.* at 16.)

Mr. Ortiz's declaration states that as of May 24, 2020, the following is a cumulative list of individuals that have tested positive for COVID-19 at ECCF:

(a) eight ICE detainees; (b) one county inmate housed at ECCF; (c) ten county inmates in Delaney Hall in COVID Housing and five county inmates who have recovered and are in non COVID Housing [. . .] (d) eighty-eight members of the ECCF correctional staff, seventy five of whom have been cleared and returned to work; and (e) four members of the civilian staff, three of whom have been cleared and returned to work.

(*Id.*)

  ii. *Petitioner's Evidence Regarding the Conditions at ECCF*

  To describe the conditions at ECCF, Petitioner provides the declaration of Rosa Santana, Program Director at First Friends of New Jersey and New York ("First Friends"), which is dated May 3, 2020. (DE 9-1.) Ms. Santana works with detainees in the New Jersey area, including those housed at ECCF. (*Id.* at 2.) She bases her declaration on information she has received from other detainees housed at ECCF, as well as tours she has previously taken of the facility. (*Id.* at 2–3.) Ms. Santana indicates that, in each housing unit at ECCF, detainees share a bathroom with a few toilets and showers, a small recreation area, and communal items such as telephones and microwaves. (*Id.* at 3–4.)[4] Ms. Santana states that detainees "do not have enough space to be [ ] 6 feet apart." (*Id.* at 4.)

  Detainees have reported to First Friends that they are not receiving adequate medical care and that the conditions at ECCF are unsanitary and unhygienic. (*Id.* at 4–5.) Detainees have indicated that it is impossible for them to maintain six feet of distance from one another, and that their water may be contaminated. (*Id.* at 5.) Detainees believe that they and other individuals in their housing units are experiencing symptoms consistent with COVID-19 and fear they will die in detention without sufficient medical care. (*Id.* at 8.) They report difficulty accessing prompt medical attention and when they do receive care, they do not receive proper follow-up treatment.

---

[4]  There is also a sink and toilet located within each cell. (*Id.* at 4.)

(*Id.* at 5.) Ms. Santana states that she personally does not believe that ECCF's infirmary is equipped to handle "this kind of mass outbreak because there is not enough space nor medical staff." (*Id.*)

Ms. Santana's declaration also recites information that she has learned from phone calls with Essex County officials. (*Id.* at 6–8.) I include only some the pertinent details Ms. Santana states that she has heard on these calls. On April 9, 2020, officials expressed concern that there were limited hospital and emergency services available during the pandemic, resulting in lengthy wait times for emergency services. (*Id.* at 7.) On April 9, 2020, Dr. Lionel Anticette, the Medical Director for ECCF, stated that social distancing is impossible in the dorms and "releasing people needs to become the norm." (*Id.*) On April 16, 2020, Essex County officials announced they were no longer accepting new ICE detainees but were accepting new county inmates, including one who was already COVID-19 positive. (*Id.*)[5] On April 30, 2020, ECCF staff explained that COVID-19 testing was only being utilized "judiciously" because the test posed risks for the medical staff. (*Id.* at 8.)

## III.    JURISDICTION

Respondents raise the threshold question of whether this Court has jurisdiction to entertain this petition. (DE 7 at 23–25.) Third Circuit case law, in their view, does not permit conditions of confinement claims to be raised through a § 2241 petition. (*Id.* at 25.) Respondents add that even if this Court did have jurisdiction, release would not be the proper remedy. (*Id.* at 26–27.) Petitioner contends, however, that his immediate release from custody—a remedy only obtainable *via* a habeas petition—is the only way to address the constitutional violations challenged in this case. (DE 18 at 17–18.)

---

[5]     According to Mr. Ortiz's declaration, ICE detainees and county inmates are housed separately. (DE 7-5 at 2.)

Historically, conditions of confinement claims have been brought pursuant to 42 U.S.C. § 1983, seeking damages or amelioration of those conditions by injunction. *See Camacho Lopez v. Lowe*, Civ. No. 20-563, 2020 WL 1689874, at *4–5 (M.D. Pa. Apr. 7, 2020). However, where an individual seeks "immediate or more speedy release," he or she is, or is deemed to be, asserting a remedy available through a habeas petition. *Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973); *see also Camacho Lopez*, 2020 WL 1689874, at *4 ("[Petitioner] seeks immediate release from custody based on what he perceives to be constitutionally deficient conditions of confinement that threaten his health and life. This is unequivocally a habeas remedy.") A habeas petition is the process by which an individual may challenge the "fact or length" of confinement. *See Preiser*, 411 U.S. at 494. To date, the United States Supreme Court has not expressly stated whether a conditions of confinement claim may be raised through a habeas corpus petition. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017) ("[W]e have left open the question whether [individuals] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."); *see also Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser*, 411 U.S. at 499 ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."). However, federal courts of appeals appear to have permitted such challenges. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242 n.5, 242–44 (3d Cir. 2005); *Jiminian v. Nash*, 245 F.3d 144, 146–47 (2d Cir. 2001); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978); *Miller v. United States*, 564 F.2d 103, 105 (1st Cir. 1977). Recent case law within this circuit has been fairly consistent in holding that an immigration detainee may challenge the conditions of his confinement

through a § 2241 petition. *See Cristian R. v. Decker*, Civ. No. 19-20861, 2020 WL 2029336, at *2 (D.N.J. Apr. 28, 2020) (collecting cases); *Thakker v. Doll*, Civ. No. 20-480, 2020 WL 2025384, at *2 (M.D. Pa. Apr. 27, 2020) (collecting cases). Within this emerging case law, several district courts have also granted release, in the form of temporary restraining orders or preliminary injunctions, to immigration detainees whose conditions of confinement were found to be unduly punitive in light of their medical conditions. *See Jose B.R. v. Tsoukaris*, Civ. No. 20-3347, 2020 WL 2744586, at *12 (D.N.J. May 27, 2020); *Cristian A.R. v. Decker*, Civ. No. 20-3600, 2020 WL 2092616 (D.N.J. Apr. 12, 2020); *Rafael L.O. v. Tsoukaris*, Civ. No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020); *Castillo v. Barr,* Civ. No. 20-605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Basank v. Decker*, Civ. No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *Thakker v. Doll*, No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) (frequently cited as the leading case). Given these considerations, I agree with the cases that have permitted conditions of confinement claims to proceed through a habeas petition. Accordingly, I find that this Court has jurisdiction over this habeas action.[6]

---

[6] Jurisdiction is properly laid in this District Court, because Petitioner is detained within this district and alleges that his detention violates the Constitution. With exceptions not relevant here, a petitioner may seek § 2241 relief only in the district wherein he or she is held in custody. *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968); *see also United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009) (reviewing case law requiring filing in district of confinement); *Gutierrez v. Gonzales*, 125 F. App'x 406, 412 (3d Cir. 2005) (surveying territorial custody requirement in relation to ICE detainees who were removed). That jurisdictional/territorial requirement flows naturally from the nature of a habeas petition, which is directed to the petitioner's custodian and alleges that the custodian is holding the petitioner in violation of the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) ("Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement.") (citations omitted); *Maleng v. Cook*, 490 U.S. 488, 490 (1989).

## IV.   LEGAL STANDARD

The petition, and its request for a TRO, seeks Petitioner's release during the pendency of his immigration proceedings. (DE 1 at 2.) Such injunctive relief is an "extraordinary remedy" and "should be granted only in limited circumstances." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994) (internal quotation marks omitted). Because the relief sought is not merely for 14 days, but for the pendency of the proceedings, I have treated this application as one for a preliminary injunction as well. The standard, however, is similar; in order to obtain a TRO or preliminary injunction, the moving party must show the following:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (alteration in original) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

A likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *See id.* Additionally, the strength of a claim on the merits is in a kind of resonance with the balance of the harms: "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 178 (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)).

# V.      DISCUSSION

## A.      Likelihood of Success on the Merits

Petitioner's sole cause of action is that his substantive due process rights are being violated by his continued detention at ECCF. (DE 1 at 12–15.) Petitioner asserts that the conditions of his confinement are unconstitutionally punitive because they are not reasonably related to a legitimate governmental objective. (*Id.* at 14.) Petitioner emphasizes that his "exacerbated case of hemorrhoids" places his immune system "in a vulnerable position," but that the "dangerous conditions" at ECCF do not permit him the ability to guard against COVID-19 infection. (DE 9 at 7–8.) Respondents maintain, however, that they have a substantial interest in Petitioner's continued detention given that he had previously been released on bond and then violated the terms of that release. (DE 7 at 39–40.) Respondents further assert that Petitioner's unsubstantiated claims of a compromised immune system due to hemorrhoids do not outweigh their interest in his detention, especially in light of the measures ECCF has implemented to protect detainees from contracting COVID-19. (*Id.* at 29–40.)

An immigration detainee's conditions of confinement claim is properly analyzed under the Due Process Clause of the Fifth Amendment. *See E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019) (holding that immigration detainees are entitled to the "same due process protections" as pretrial detainees). Consistent with due process, "a detainee may not be punished prior to an adjudication of guilt." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). To determine whether a challenged condition amounts to punishment, a court will consider whether it "is reasonably related to a legitimate government objective." *Sharkey*, 928 F.3d at 307. If it is not, then a court may infer "that the purpose of the governmental action is punishment that may not be

constitutionally inflected upon detainees *qua* detainees." *Id.* (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).

Conditions of confinement are "reasonably related" to a legitimate governmental objective if they serve a legitimate purpose and be rationally related to that purpose. *See Hubbard*, 538 F.3d at 232. A challenged condition may amount to impermissible punishment if there is "an expressed intent to punish on the part of detention facility officials," if there is no "alternative purpose to which [the condition of confinement] may rationally be connected is assignable for it," or if the condition is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).

The COVID-19 pandemic is too recent to have produced definitive guidance from the United States Supreme Court or the United States Court of Appeals for the Third Circuit regarding conditions of confinement claims. Some principles have emerged from the case law in this district, however. In general, whether an immigration detainee's conditions of confinement amount to punishment will depend primarily on the detainee's health and the specific conditions at the detention facility. *See Cristian R.*, 2020 WL 2029336, at *2; *Thakker*, 2020 WL 2025384, at *8; *Rafael L.O.*, 2020 WL 1808843, at *7–8. Results have varied depending on the facts of the case; "many courts have found that insufficient jail action in light of the virus can serve as a basis for release . . . while many others have found that, where the jail takes adequate precautions in light of a given petitioner's medical history, no such relief is warranted." *Cristian R.*, 2020 WL 2029336, at *2.

Judge Vazquez has contributed a useful tripartite classification of cases:

> (1) detainees who do not fall into a particularly vulnerable category;
>
> (2) detainees who fall into a particularly vulnerable category (based on age or underlying medical/physical conditions); and

14

(3) detainees who have tested positive for COVID-19.

*Romeo S.K. v. Tsoukaris*, Civ. No. 20-5512, 2020 WL 2537647, at *5 (D.N.J. May 18, 2020) (line breaks added). The petitions of detainees in the first category (no particular risk factors), Judge Vazquez states, have generally been denied. *Id.* Those in the second category (prisoners with risk factors) have been granted or denied depending on the circumstances—especially, whether the legitimate interests of ICE (in particular, flight risk and dangerousness) can be accommodated by available conditions of release. *Id.* For those in the third category—detainees who have the virus—the critical question becomes, in Judge Vazquez's view, not release as such, but whether the detainee is receiving prompt and adequate care. *Id.*

Here, although Petitioner suffers from hemorrhoids, he has not demonstrated that his condition compromises his immune system or places him at higher risk for severe illness if he contracts COVID-19. The only evidence Petitioner has provided are his medical records and an internet article which delineates proper treatment for his condition. These materials do not indicate that Petitioner's immune system is compromised by his hemorrhoids and this condition is not listed by the CDC as one which places him at "higher risk" for serious illness from COVID-19. (*See generally* DE 8; DE 9-2.); *see also* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited June 10, 2020). Petitioner, therefore, falls into the category of cases that involve petitioners who are not particularly vulnerable to the virus. *See Nohasses G. C. v. Decker*, Civ. No. 20-4653, 2020 WL 2507775, *10–11 (D.N.J. May 15, 2020) (denying release to petitioner at ECCF whose alleged medical conditions did "not qualify as CDC risk factors for COVID-19"); *Carlos M. D. v. Anderson*, Civ. No. 20-3908, 2020 WL 2487646, at *9 (D.N.J. May 14, 2020) (denying relief to petitioner who did not have any underlying health

15

conditions which placed him at higher risk for severe illness if infected by COVID-19); *Derron B. v. Tsoukaris*, Civ. No. 20-3679, 2020 WL 2079300, *9 (D.N.J. Apr. 30, 2020) (finding that petitioners' young age and absence of underlying health condition "do not support the notion that they may be particularly susceptible to the virus" and accordingly, could not overcome legitimate government interest in their detention); *Carmen R. v. Decker*, Civ. No. 20-3875, 2020 WL 2029337, at *9–10, 12 (D.N.J. Apr. 28, 2020) (finding petitioner could not succeed on her conditions of confinement claim given facility's efforts to prevent the spread of COVID-19 and her unsubstantiated medical conditions). Additionally, Petitioner's medical records demonstrate that he has been receiving regular treatment for his hemorrhoids. (*See generally* DE 8.) He has been seen on multiple occasions for his ailments, been prescribed treatment, and even referred to a local hospital when it was determined by ECCF medical staff that he needed further evaluation. (*See generally id.*) In short, it appears that Petitioner's hemorrhoids are being treated appropriately.[7]

---

[7]    Petitioner states that he is not being provided with "the full treatment prescribed by the physicians." (DE 9 at 10.) He indicates that when he was treated at the local hospital, the doctors "concluded that he needed an emergency surgery and continued treatment to care for the already complication condition." (DE 1 at 10.) Petitioner alleges that "[d]espite the advice from the doctors and hospital staff, [he] was returned to Essex County Correctional Facility without access to any additional medical treatment or sensible meals that can contribute to better his condition." (*Id.*)

First, the medical records provided do not state that Petitioner needs *emergency* surgery, but rather *elective* surgery. (DE 8 at 80.) The records also indicate that the hospital recommended Petitioner be prescribed Anusol cream (which Petitioner is receiving), maintain soft stool, and avoid straining. (*Id.*) The medical records do not indicate that hospital directed that he receive "sensible meals." (*Id.* at 80–101.) Thus, the basis for Petitioner's contention that he is not receiving the "full treatment prescribed by the physicians" is unclear.

Second, I note that Petitioner has not raised a claim of inadequate medical care. Even if he had, however, his allegations do not amount to any more than a disagreement over the proper course of treatment for his hemorrhoids. Such disagreement is insufficient to state a claim of inadequate medical care. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (holding that " 'mere disagreement as to the proper medical treatment' " is insufficient to establish a constitutional violation (quoting *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987))).

Further, Respondents have presented substantial evidence that—after an inevitable catch-up period—ECCF has implemented protocols to minimize and contain infection. (*See* pp. 5–7, *supra*, for more detail.) Although bunk beds in the individual cells (spaced around the housing unit) are close together, the central area of the housing unit has sufficient space. The method of serving meals has changed; they are now furnished to detainees in their cells or the recreation area. Smaller groups are permitted to take recreation simultaneously. The detainees have been educated as to sanitary practices.

ECCF has hired additional staff to clean, and the detainees, too, have been enlisted so that cells and common areas are sanitized frequently. Detainees have free access to soap and are encouraged to use it. Access to disinfectant agents is controlled, for safety reasons, but it is available.

Medical care complies with CDC guidelines. Surgical masks are issued, not to everyone, but to those with symptoms suggesting COVID-19. Those with moderate to severe symptoms are sent to the hospital; those with mild symptoms are quarantined. Symptomatic persons are immediately placed on anti-viral medications and their vitals are monitored daily. Detainees who may have been exposed to a confirmed case are "cohorted" for fourteen days to prevent any further spread. Detainees with health conditions identified by the CDC as high risk are housed separately; individuals with "well-controlled" chronic conditions, however, remain in general population.

Much of the evidence of conditions in the facility provided by Petitioner is not specific to the conditions he, himself, is experiencing. (DE 9-1.) Ms. Santana's declaration is dated May 3, 2020 and does not appear to be indicative of the present conditions at ECCF. The COVID-19 pandemic is a rapidly changing situation and ECCF has continued to adapt their protocols to evolve. I recognize that complete protection against COVID-19 is unattained and indeed

unattainable, as evidenced by the number of positive tests at ECCF. Thus, while Respondents have presented evidence of great efforts to thwart the spread of COVID-19, I recognize that the risk of infection remains. I therefore weigh Petitioner's vulnerability against that risk, and in light of Respondents' legitimate interests in continued detention.

Respondents have a legitimate governmental objective in enforcing immigration laws, protecting the community, and preventing individuals from absconding. *See Jorge V. S. v. Green*, Civ. No. 20-3675, 2020 WL 1921936, at *4 (D.N.J. Apr. 21, 2020); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) (stating that detention can ensure a detainee does not abscond or engage in criminal activity before a final determination as to their immigration status can be made); *Zadvydas v. Davis*, 533 U.S. 678, 690–91 (2001) (identifying "ensuring the appearance of aliens at future immigration proceedings" and "protecting the community" as governmental objectives). Petitioner is detained pursuant to ICE's discretionary authority under 8 U.S.C. § 1226(a). (DE 1 at 12; DE 7 at 27.)

Petitioner was once released on bond. While on release, he was criminally charged with aggravated assault. As a result, his release was revoked and he and was re-detained. (DE 1-3 at 4; DE 7 at 9.)

In weighing the preventive measures taken by ECCF, the absence of a medical condition which would make this Petitioner particularly vulnerable to a COVID-19 infection, and the legitimate interests of the government, I do not find that Petitioner's present circumstances are excessive in relation to the purpose of his detention. Accordingly, Petitioner has not demonstrated a likelihood of success on the merits of his conditions of confinement claim.

**B.**     **Irreparable Harm**

The second factor in determining whether an individual is entitled to a TRO or preliminary injunctive relief requires the moving party to show that he is "more likely than not to suffer irreparable harm" absent the relief requested. *Reilly*, 858 F.3d at 179. Petitioner argues that if he is "forced to continue to live without taking heed of the medical recommendations to treat his condition, his hemorrhoid condition will inevitably become infected thereby placing him under an immunocompromised condition." (DE 9 at 9.) He states that remaining under the "dangerous conditions at ECCF while his body fights an infection with little to no drug treatment will certainly lend an environment where he is more likely than not to suffer irreparable harm due to a COVID-19 infection." (*Id.*)

No one disputes that actually contracting a case of COVID-19 would constitute a harm that meets the irreparable harm requirement.  However, as discussed previously, Petitioner has not shown that he suffers from a medical condition which places him at higher risk for severe illness if infected by COVID-19. Petitioner's contention that his hemorrhoids *may* become infected and thereby compromise his immune system is conjectural. Petitioner has not provided any evidence that he is, or will become, immunocompromised due to his medical ailment.

Moreover, as Judge Salas recently recognized "the threat of COVID-19 alone—when viewed against Petitioner's unsubstantiated [medical condition] as well as [the facility's] efforts to combat the virus's spread in light of Petitioner's purported medical conditions—cannot be the sole basis for irreparable harm." *Carmen R.*, 2020 WL 2029337, at *13 (citing *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020)). The same holds true here as well. Accordingly, Petitioner has not demonstrated that he is more likely than not to suffer irreparable harm unless he is released from detention.

**C.    Balancing of the Equities**

Having found that Petitioner has not met the two "gateway factors" – likelihood of success on the merits and irreparable harm – I need not address the remaining two factors, the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest. *See Reilly*, 858 F.3d at 179 (holding that a court considers the final two factors only if the first two "gateway factors are met"); *see also Carmen R.*, 2020 WL 2029337, at *13 (declining to address the final two factors after determining that movant had not demonstrated a likelihood of success on the merits or irreparable harm).

## VI.    CONCLUSION

For the foregoing reasons, the petition (DE 1) is denied. An appropriate Order accompanies this Opinion.

DATED: June 16, 2020

/s/ Kevin McNulty

_____
KEVIN MCNULTY
United States District Judge